Golia, J.P
(dissenting and voting to affirm the order, insofar as appealed from, in the following memorandum). My dissent turns on the unique nature and reality of the assignment of claims for first-party benefits under the Insurance Law and the no-fault regulations of this State.
Prior to addressing this issue, it is important to note the specific circumstances herein. In the case at bar, the indicia of fraud are so significant and unabashed that it is difficult to relegate them to the level of a “founded belief.” Even the most cursory examination of the facts of this case should elicit the reaction, “Are you kidding?”
Further, it should be noted that the two underlying collisions before this court were previously addressed by the Supreme Court in the Tenth Judicial District. Two different Justices independently found that each of these collisions was actually part of a scheme to defraud the insurance carrier. Both Supreme *70 Court Justices determined that the underlying policies were null and void as regards the collisions, and declared that all the individuals allegedly involved therein were not eligible injured persons.
Specifically, the April 29, 1999 collision involved a car that was owned by Mr. Rgevsky, driven .by Mr. Vistocci, and had the assignors Mr. Elkin and Ms. Andreeva as passengers who were allegedly injured in that incident. That same auto, still being driven by Mr. Vistocci but bearing another passenger, was then involved in a collision approximately 10 hours later.
A mere three days thereafter, on May 2, 1999, that same auto was involved in a third collision. Amazingly, Ms. Andreeva, who was an allegedly injured passenger in Mr. Rgevsky’s car on April 29, 1999, is now an allegedly injured passenger in the car that Mr. Rgevsky’s car struck.
In addition, Mr. Rgevsky owned other vehicles which were involved in numerous other collisions. The driver, Mr. Vistocci, also owned several vehicles which were involved in several collisions. Coincidentally, Mr. Vistocci, although the owner of these vehicles, was not the driver involved in these numerous collisions. Additionally, I note that these vehicles were in collisions within 10 to 15 days of first being insured and the policies were then cancelled shortly thereafter due to nonpayment of premiums.
The June 8, 2000 collision involving assignors Anderson and Leveile is no less suspect. In fact, the subject collision was the second accident on that night involving the same car. Similar to the April 29, 1999 collisions, these collisions involved a car that was owned by one individual and driven by another and contained different passengers for each of the two collisions that occurred on the same date. In this instance, the two collisions were less than two hours apart. In addition, the driver involved in these two collisions was also involved in three more collisions within one month of the June 8, 2000 collisions. The facts establish that this driver was involved in at least five collisions in less than 12 days.
Furthermore, Mr. Anderson, one of the allegedly injured parties in one of the June 8, 2000 collisions, was also a passenger in a July 17, 2000 collision and also obtained insurance coverage in his own name on August 22, 2000. Six days later, he was then involved in his own collision on August 28, 2000 and again on September 6, 2000.
*71 Several of the individuals involved herein simply failed to appear at defense-requested examinations under oath (EUOs). Mr. Anderson, however, appeared at an EUO and stated that he went for acupuncture once and refused to go again, which clearly contradicts the claim submitted for 43 separate acupuncture treatments.
It is important to note that, practically, the methodology of obtaining assignments under no-fault is directly opposite, indeed the mirror image, of obtaining assignments in many other circumstances where rights and obligations are assigned.
In those other circumstances, generally the assignor has either obtained or has otherwise come into possession of an obligation to receive something of value. The assignor thereafter assigns that obligation to the assignee, who then stands in the shoes of the assignor and possesses the right to demand payment of the obligation or receipt of the item of value under the terms of the original agreement. The assignee is now possessed with the right to any legal remedy that the assignor had possessed.
However, in nearly every instance involving the assignment of a no-fault claim, the claim only comes into existence after the assignment of first-party benefits is executed. In general terms, an individual (eligible injured person) who has been in an automobile accident goes to a medical provider for necessary medical treatment. Prior to obtaining that treatment, the medical provider obtains an executed “assignment of benefits” form that assures the medical provider that payment will be forthcoming from the insurance carrier. It is at that juncture that treatment is provided to the individual, and a claim is then generated and sent to the insurance carrier for payment.
There is another difference. Under the No-Fault Law, an insurance carrier is obligated to pay for any and all necessary medical treatments covered under the policy if that claim is properly completed and properly filed within 45 days of the treatment that was rendered. It is highly unusual outside the world of no-fault for an assignee to participate in “creating” the claim that is being assigned to them. Furthermore, under no-fault, the claim is, of necessity, always submitted after treatment is rendered and in almost every instance is submitted by the medical provider, which has first obtained an assignment from its patient. Indeed, this practice is so prevalent that the courts have held that an assignment need only contain a stamp which states “signature on file.” Additionally, another distinc *72 tion, no less important, is that an assignor who fails to comply with his obligations under the no-fault regulations remains financially responsible for the cost of treatment in the event the claim is then denied by the insurance carrier.
My colleagues find support in the well-reasoned decision by the Court of Appeals, to wit, Gramatan Home Invs. Corp. v Lopez (46 NY2d 481 [1979]). In that case, the defendant homeowners purchased vinyl siding for their home and financed the cost by entering into a retail installment contract backed by a mortgage on the home. The note and bond were assigned to the plaintiff shortly after they were executed. Approximately two years later, the New York State Attorney General commenced a consumer-fraud action against the plaintiff’s assignor and obtained a judgment which declared the contract between the assignor and the homeowner void. The assignee then sued for payment, and the defendant homeowner moved for dismissal under the theory of collateral estoppel.
The Court of Appeals analyzed the doctrine of collateral estoppel and its purpose, as well as the broader doctrine of res judicata. The Court’s analysis first addressed the issue of privity and found that although there is no requirement that collateral estoppel be confined to those named in the previous action, there must nevertheless be privity between those two parties. The Court then found that there must be “privity” in an assignor-assignee relationship inasmuch as such relationship “denote[s] a mutually successive relationship of the same rights to the same property” (id. at 486).
The Gramatan Court acknowledged that an assignor-assignee relationship is effectively a mutually successive relationship but found that the
“crucial inquiry focuses upon the juncture at which the relationship between the party to the first action and the person claimed to be his or her privy is established. In the assignor-assignee relationship, privity must have arisen after the event out of which the estoppel arises. Hence, an assignee is deemed to be in privity with the assignor where the action against the assignor is commenced before there has been an assignment” (id. at 486-487 [emphasis added]).
The reasoning for this determination is set forth in the very next sentence: “In that situation, at the time the assignee succeeded to the rights of the assignor . . . the assignee is charged *73 with notice that his rights to the assignment are subject to [a] competing claim” (id. at 487).
I submit that this set of circumstances could not be possible in the realities of a no-fault claim. The simple fact is that a filed claim could not exist prior to the assignment of that claim. It would, therefore, be impossible for an action to be commenced prior to the assignment of a claim that had not yet come into existence.
Clearly, an important distinction in the realm of no-fault is that there is more than the simple privity borne of succession between the assignor (eligible injured person) and the assignee (medical provider). There is a virtual identity of interests by the very existence of the claim. In fact, there is an inextricable connection between the assignor eligible injured person and the assignee medical provider that is acknowledged by Insurance Department Regulations (11 NYCRR) § 65-3.11 (d), which provides for direct payments to the medical provider and states that “[i]f an assignment has been furnished to an insurer, the assignor . . . shall not unilaterally revoke the assignment after the services for which the assignment was originally executed were rendered.”
Under subdivision (b) (1) of the same section, the regulation allows for direct payment to the medical provider by means of an authorization to pay benefits, which provides for the payment of benefits but does not transfer all rights. Under those circumstances the assignor may still remain ultimately responsible for payment of the bill.
It is for these reasons that both the eligible injured person and the medical provider share the same identity when we view a no-fault claim for medical services.
The argument set forth in Gramatan, which is certainly applicable in the general circumstances of assignments, does not apply to no-fault assignments where the assignment comes simultaneously with the service provided and well before the “claim” is submitted. This interpretation was borne out in Long Is. Radiology v Allstate Ins. Co. (36 AD3d 763 [2007]), which essentially denied payment of assigned no-fault benefits to the assignee-plaintiff (medical provider), for services performed based entirely on the actions of the assignor (eligible injured person), which did not occur until after the assignment was made. In simple terms, the eligible injured person was involved in an accident and went to a medical provider, who determined that the insured needed to have an MRI study done and wrote a *74 prescription for it. The eligible injured person went to a radiology group with the prescription, assigned his no-fault benefits and had the MRI study performed. The radiology group filed a claim, and it was denied because medical necessity was not established. In such case, the defendant’s objection to such treatment was not and could not have been raised until after the MRI study was done and after the assignment was completed. Nevertheless, the Appellate Division had no difficulty in dismissing the assignee’s claim.
To avoid any possible confusion that might arise by a comparison between my dissent in this matter and concurrence in the holding of Mid Atl. Med., P.C. v Victoria Select Ins. Co. (20 Misc 3d 143[A], 2008 NY Slip Op 51758[U] [App Term, 2d & 11th Jud Dists 2008]), I will address the facts in that case.
In Mid Atlantic, the actual named insured had made material misrepresentations on his application for the subject insurance policy, and, subsequently, a court in Virginia issued a declaratory judgment holding the policy to be void ah initio. Like the case at bar, the declaratory judgment action in Virginia was not commenced until after the eligible injured persons had assigned their rights to the medical provider claimants.
However, unlike the case at bar, those eligible injured persons were in no conceivable way involved in the fraudulent acts of the named insured when he made his material misrepresentations on his application for insurance. Therefore, unlike the case at bar, the assignors were completely unaware of any improper conduct or failure to comply with the requirements of no-fault such as would create grounds for a denial of payment.
Those circumstances are completely different from the matter at bar in which all the eligible injured persons were found to have been involved in a scheme to defraud the insurance carrier and the “accident” was found to have simply never occurred.
My colleagues who are in the majority in the present matter were also in the majority in A.B. Med. Servs. PLLC v Commercial Mut. Ins. Co. (12 Misc 3d 8 [App Term, 2d Dept 2006]) and held “that only innocent third parties who are injured are protected . . . and not a health care provider who deals with the assignor-insured at its peril in accepting an assignment of the insured’s no-fault benefits” (id. at 11).
In the case before us now, as opposed to the case of Mid Atlantic, the individuals who allegedly obtained medical treatment and assigned their rights knew at the time that they did *75 not present themselves with clean hands in this case, that there was no legitimate accident, and that there were no necessary medical treatments required for an accident that did not occur.
That now resolves a further issue also relied on by the majority predicated on the clear holding of the Court of Appeals in Kaufman v Eli Lilly & Co. (65 NY2d 449, 456-457 [1985]):
“[It is well settled that] collateral estoppel. . . [applies only] to matters actually litigated and determined in a prior action. If the issue has not been litigated, there is no identity of issues between the present action and the prior determination. An issue is not actually litigated if . . . there has been a default” (internal quotation marks and citations omitted).
It is my belief that such holding is inapplicable in this case, largely for the reasons set forth above, that is, that the medical provider and the eligible injured person are so inextricably connected to each other and to the creation of the claim at issue, that the actions of one must be referable to the legal position of the other.
The Court of Appeals understood that there are a myriad of circumstances which cannot be anticipated by the courts. Therefore, any analysis of the application of collateral estoppel requires
“consideration of the realities of litigation . . . [and] competing policy considerations, including fairness to the parties, conservation of the resources of the court and the litigants, and the societal interests in consistent and accurate results. No rigid rules are possible, because even these factors may vary in relative importance depending on the nature of the proceedings” (Staatsburg Water Co. v Staatsburg Fire Dist., 72 NY2d 147, 153 [1988] [internal quotation marks and citations omitted]).
My findings are that the circumstances in this case, as set forth in some detail above, require a finding that fairness, consistency and societal interests are best served by dismissing this action.
In addition, as is demonstrated in the recent case of Gaston v American Tr. Ins. Co. (11 NY3d 866 [2008]), the Court of Appeals does not adhere to a hard and fast rule that “[a]n issue is not actually litigated if . . . there has been a default” (Kaufman, 65 NY2d at 456-457). In fact, the Court of Appeals’ holding in Gaston stated that
*76 “[t]he plaintiffs proffered two default judgments that resolved the coverage issue against the insurer while the insurer demonstrated that the same . . . question had been adjudicated in a third proceeding resulting in a judgment in the insurer’s favor. In light of these conflicting judgments on the same issue, application of the doctrine of collateral estoppel was not warranted” (11 NY3d at 867-868 [emphasis added]).
As can be seen, the Court of Appeals considered the default judgments as adjudications that were in conflict with another judgment holding the opposite position on the same issue. Inasmuch as the Court of Appeals considers default judgments as adjudications on the merits for the purpose of denying collateral estoppel, we should not consider the statement in Kaufman as much a bright-line rule as it appears.
Finally, I disagree with the majority’s finding that the order of the Civil Court which is the subject of this appeal granted defendant’s motion solely on the grounds of collateral estoppel and that it did not address the second ground for relief, to wit, “that the underlying incidents . . . were staged events rather than ‘accidents.’ ”
The Civil Court in its order stated that “[defendant has shown, upon papers and proof submitted, that plaintiff s cause of action is without merit” (emphasis added). The court then went on to state, “A declaratory judgment has the effect of a final judgment even when issued on default.”
Clearly, the second statement cited relates to the first branch of defendant’s motion which seeks dismissal of the complaint pursuant to the doctrine of res judicata, of which collateral estoppel is a subset. Indeed, in the first statement from the court’s decision, the judge found that defendant had submitted proof that established that plaintiff’s cause of action was without merit. That was not a finding of issue preclusion due to collateral estoppel, but rather a finding on the merits that plaintiffs cause of action lacked merit.
It is for all these reasons that I dissent and vote to affirm the order of the Civil Court, insofar as appealed from.
Pesce and Rios, JJ., concur; Golia, J.E, dissents in a separate memorandum.